IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| PIONEER HI-BRED INTERNATIONAL, INC., CORTEVA AGRISCIENCE, LLC, AGRELIANT GENETICS, LLC, BECK'S SUPERIOR HYBRIDS, INC., and WINFIELD SOLUTIONS, LLC,<br><br>Plaintiffs,<br><br>vs.<br><br>ALTEN, LLC, MEAD CATTLE COMPANY, LLC, GREEN DISPOSAL MEAD LLC, PLATTE RIVER GREEN FUELS, LLC, and TANNER SHAW, in his individual and official capacities,<br><br>Defendants. | **8:22CV70**<br><br><br>**MEMORANDUM AND ORDER ON JOINT MOTION FOR PRELIMINARY INJUNCTION** |
| SYNGENTA SEEDS, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>ALTEN, LLC, MEAD CATTLE COMPANY, LLC, GREEN DISPOSAL MEAD LLC, TANNER SHAW, and SCOTT TINGELHOFF,<br><br>Defendants. | **8:22CV71**<br><br><br>**MEMORANDUM AND ORDER ON JOINT MOTION FOR PRELIMINARY INJUNCTION** |
| BAYER US LLC,<br><br>Plaintiff,<br><br>vs.<br><br>ALTEN, LLC, MEAD CATTLE COMPANY, LLC, GREEN DISPOSAL MEAD LLC, PLATTE RIVER GREEN FUELS, LLC, and TANNER SHAW, in his individual and official capacities,<br><br>Defendants. | **8:22CV82**<br><br><br>**MEMORANDUM AND ORDER ON JOINT MOTION FOR PRELIMINARY INJUNCTION** |

1

These consolidated cases arise from the failure of an ethanol manufacturing plant in Mead, Nebraska. Filing 1 at 1 (¶ 1).[1] The plaintiffs supplied corn and other seed for use in the ethanol manufacturing process and the defendants operated the ethanol plant. Filing 1 at 2 (¶¶ 2–3). Hence, the Court will refer to the parties as the Seed Companies and the Operators, respectively. In these actions, the Seed Companies seek to recover from the Operators the costs that the Seed Companies have incurred in responding to the environmental conditions left behind at the failed ethanol plant and stabilizing the site when the Operators failed to take such actions. Filing 1 at 1 (¶ 1).[2]

These cases are now before the Court on the Seed Companies' Joint Motion for Preliminary Injunction and Order of Immediate Attachment Pursuant to Fed. R. Civ. P. 65(a), 64(a)–(b), and Neb. Rev. Stat. § 25-1001 *et seq*. Filing 51. The Seed Companies seek a preliminary injunction enjoining the Operators from transferring or concealing any and all assets and property of the Operators and related entities (the Related Entities) and the prejudgment attachment of all such assets and property. Filing 51 at 2. The Seed Companies contend that such relief is necessary or there will be no assets left for them to recover from the Operators when judgment is ultimately entered in their favor on their claims of breach of contract, contractual indemnity, voidable transfers, common law indemnity, contribution, equitable subrogation, unjust enrichment, fraud in the inducement, and promissory estoppel. Filing 55 at 3; *see also* Complaint, Filing 1 at 21–34 (¶¶ 106–179).

The Court filed an Order that among other things set a hearing on the Joint Motion for February 3, 2023. Filing 94. The Court has considered the parties' evidence and arguments

---

[1] Citations to documents on the docket are to the docket number and docket page number and where appropriate the paragraph number—*e.g.*, Filing 1 at 1 (¶ 1). Unless expressly indicated otherwise, all citations are to the docket in the lead case, Case No. 8:22cv70. All exhibits submitted at the preliminary injunction hearing were previously filed and were identified by their docket filing numbers.

[2] Similar but not necessarily identical allegations are found in the Complaints in the other two consolidated cases.

submitted prior to and at the preliminary injunction hearing, as well as a pre-hearing Amicus Curiae Brief filed by the State of Nebraska. The Court now grants the Joint Motion for Preliminary Injunction, albeit not on precisely the terms requested by the Seed Companies.

By way of summary, the Court concludes that the Seed Companies seek available preliminary injunctive relief on equitable claims, not simply money damages on claims at law. The specific equitable claims that the Court finds make such preliminary injunctive relief available are claims for subrogation and unjust enrichment and claims under the Nebraska Uniform Voidable Transactions Act (UVTA). For this and other reasons, the Court finds it unnecessary to consider the Seed Companies' request for attachment of assets.

Having concluded that a preliminary injunction is an available remedy in this case, the Court turns to consideration of whether the Seed Companies have established that they are entitled to such a remedy. To obtain a preliminary injunction, "'[a] plaintiff . . . must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.'" *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 665 (8th Cir. 2022) (bracketed numbers inserted) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

As to "likelihood of success on the merits," the Court rejects the Operators' argument that the Seed Companies cannot recover for "voluntary" payments. The Court concludes that the Seed Companies' remediation efforts satisfy the requirements of the "emergency assistance" doctrine as defined in the Restatement (Third) of Restitution and Unjust Enrichment § 22. The Court also rejects the Operators' argument that the Seed Companies cannot recover because the Seed Companies lack privity of contract with Mead Cattle, Green Disposal, Platte River, and Related Entities. The Court finds that privity is not a requirement of the equitable claims on which the Seed Companies rely for available preliminary injunctive relief. The Court also rejects the Operators'

argument that the Seed Companies must "pierce the corporate veil" or demonstrate that various entities are "alter egos" of the Operators to obtain preliminary injunctive relief against them. Even without reaching the question of whether the corporate identities of any Operators or Related Entities must be disregarded, the Court concludes that it has the authority to grant a preliminary injunction against all the entities at issue because they fall within the scope of entities that can be enjoined pursuant to Rule 65(d)(2) of the Federal Rules of Civil Procedure.

Just as importantly, the Court concludes that the Seed Companies have a fair chance of proving their equitable claims on which their Joint Motion for Preliminary Injunction is based. The Court finds in essence that the record so far shows that the Seed Companies have a fair chance of showing that they fulfilled the Operators' obligation to effect remediation at the site of the failed ethanol plant when the Operators did not do so, thus entitling the Seed Companies as a matter of equity to recover assets from the Operators. As to the UVTA claim, the Court finds further that the Operators intended to conceal some of those assets. Thus, the "likelihood of success" factor weighs heavily in favor of preliminary injunctive relief.

As to "irreparable harm," the Court rejects the Operators' argument that the Seed Companies seek only economic losses that can be remedied at law with money damages. Instead, the Court notes that, under applicable law, the threat of unrecoverable economic loss does qualify as irreparable harm. The Court finds such irreparable harm is likely in the face of the Seed Companies' expenditure of nearly $28 million so far to fulfill the Operators' remediation obligations, which the Seed Companies seek to recover; the total of something less than $1.8 million dollars in cash assets left to the Operators; the Operators' monthly "cash burn" of over $100,000 per month; and the strong likelihood that the cash will be dissipated before any judgment is entered.

As to the "balance of harms," the Court is persuaded that a complete asset "freeze" would effectively put the Operators out of business and damage their position in this and other litigation. Further, and as *amicus curiae* the State of Nebraska explains, such relief would make AltEn unable to fund the few activities it has been performing for necessary permit compliance and other activity under a consent order with the State. Thus, this factor warrants some limitation on the extent of the "freeze" of assets to accommodate certain demonstrably necessary expenses. Likewise, the State of Nebraska's concern about a total asset "freeze" is a persuasive statement of the "public interest." Thus, this factor also counsels a limitation on the extent of any preliminary injunction to allow the Operators to perform certain tasks, including monitoring and permitting.

Although the Court will allow the Operators access to assets for certain demonstrably necessary categories of expenses, the Court will otherwise enjoin the Operators, their officers, agents, servants, employees, attorneys, and other persons or entities who are in active concert or participation with the Operators, specifically including certain Related Entities, from dissipating assets pending the conclusion of this litigation.

## I.   INTRODUCTION

### A.   Factual Background[3]

*1.     The Ethanol Plant Operations*

The Seed Companies were among companies that would supply corn, wheat, sorghum, milo seed, and other grains (collectively, Seed) to defendant AltEn, LLC, for use in its ethanol manufacturing process. Filing 1 at 8 (Filing 31). The Operators ran an ethanol plant in Mead,

---

[3] This statement of the factual background is drawn from the Complaint in the lead case, occasionally with additions from the Complaints in the other two consolidated cases, the factual statements in the parties' briefs and the *amicus curiae* brief of the State of Nebraska, and evidence submitted at the preliminary injunction hearing. Unless otherwise indicated, these factual statements appear to be undisputed. The Court's factual findings in this decision are provisional and not binding in future proceedings. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("[F]indings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits[.]") (citations omitted); *SEC v. Zahareas*, 272 F.3d 1102, 1105 (8th Cir. 2001) (same).

Nebraska, as a "closed-loop" system comprising an ethanol manufacturing plant (defendant AltEn), cattle feedlot (defendant Mead Cattle Company, LLC), and a biochar production unit (defendant Green Disposal Mead, LLC). Filing 1 at 2 (¶¶ 2, 13, 15, and 17). Defendant Tanner Shaw was the president of all three entities and directed and controlled them. Filing 1 at 2 (¶ 2).[4]

Somewhat more specifically, the AltEn Facility in Mead, Nebraska, began ethanol manufacturing operations on or about January 9, 2015, and used grain (primarily corn) to produce approximately 24,000,000 gallons of ethanol annually. Filing 1 at 7 (¶ 23). Mead Cattle owned and operated a cattle feedlot located on the immediately adjacent property to the AltEn Facility. Filing 1 at 7–8 (¶ 24). Mead Cattle transferred manure to the AltEn Facility, where AltEn's two digesters would then turn the manure into methane used to power its ethanol production, and AltEn would convey byproduct from the ethanol production, known as wet distiller's grains, to Mead Cattle's feedlot as feed for the cattle. Filing 1 at 8 (¶ 24). Green Disposal owned a biochar unit at the AltEn Facility on a site that shared an entrance with AltEn and Mead Cattle. Filing 1 at 8 (¶¶ 25, 29). The biochar unit heated ethanol production byproduct to create another charcoal-like byproduct known as biochar, which can be used as a soil amendment. Filing 1 at 8 (¶ 25). The biochar was stored in large totes called supersacks that were made of a flexible woven fabric. Filing 1 at 8 (¶ 26). AltEn used the biochar unit to process some of the distiller's grain it stored, but AltEn allowed the remaining distiller's grain to pile up at the AltEn Facility. Filing 1 at 8

---

[4] Pioneer's Complaint in the lead case identifies an additional defendant (Operator) as Platte River Green Fuels, LLC, but it appears that the role of that entity is to own shares of other entities, including AltEn. Filing 1 at 21 (¶ 103). Syngenta's Complaint in Case No. 8:22cv71 alleges that an additional defendant, Scott Tingelhoff, helped Shaw run all the companies' operations. Case No. 8:22cv71, Filing 1 at 1 (¶ 2). Bayer's Complaint in Case No. 8:22cv82 does not name Tingelhoff as a defendant, but does name Platte River Green Fuels, LLC, as a defendant. Case No. 8:22cv82, Filing 1. Bayer alleges that Platte River is a Kansas limited liability company with Shaw as its president, but Bayer—like Pioneer—does not allege what Platte River does as part of the ethanol production operation or system. *See* Case No. 8:22cv82 at 1 (¶¶ 2, 10). Counsel for the Seed Companies explained at the preliminary injunction hearing that Platte River is an "interwoven" company with AltEn, LLC, and the Operators did not dispute that characterization.

(¶ 27). This system demonstrates that the Operators were in active concert or participation with each other in the ethanol production.

Pioneer, Bayer (and its former Monsanto division), Syngenta, AgReliant, and Beck's contracted with AltEn to supply surplus chemically-treated seed to AltEn for use in the ethanol manufacturing process. Filing 55 at 7 (¶ 16).[5] The Seed Companies contend, and the Operators do not dispute, that the contracts required AltEn to utilize seed it received from the Seed Companies in a safe and lawful manner and to comply with all applicable laws and regulations in AltEn's management, storage, and disposition of byproducts from the ethanol manufacturing process. Filing 55 at 8 (¶ 17). In the contracts, AltEn represented and warranted that AltEn had the requisite experience, knowledge, and expertise, suitable facilities, and qualified personnel to utilize the Seed. Filing 55 at 8 (¶ 18). Further, AltEn is contractually required to indemnify and hold Syngenta, Bayer, Pioneer, and AgReliant harmless from and against any and all claims, damages, losses, costs, and expenses arising out of or connected with the Seed, including AltEn's utilization of the Seed or any other activities or operations of AltEn and its employees and agents, including negligence of AltEn or its employees and agents. Filing 55 at 8 (¶ 19). Finally, AltEn is required to indemnify and hold Bayer and Syngenta harmless for AltEn's failure to comply with any applicable laws, orders, rules, or regulations, in addition to liabilities or damages resulting from any contamination of water, air, land, or the environment. Filing 55 at 8 (¶ 20). Plaintiff Winfield did not enter into an agreement governing its transfer of Seeds to AltEn; nevertheless, the Seed Companies contend that, through their course of dealing, Winfield and AltEn understood and

---

[5] The contracts are submitted to the record as follows: Aff. of Palmer, Filing 60-1 (Pioneer); Aff. of Herr, Filing 62-1 (Beck's); Aff. of Bowers, Filing 64-1 (Monsanto); Aff. of Connors, Filing 59-1 (Syngenta); Aff. of DuBois, Filing 63-1 (AgReliant). Counsel for the Seed Companies explained at the preliminary injunction hearing that plaintiff Corteva Agriscience, LLC, is a seed company, but its role as a plaintiff in this case is because it was a member of the group identified below as FRG that undertook remediation of the ethanol plant site.

agreed that AltEn would use Winfield Seed for purposes other than planting, food, or seed and in a manner that complies with all applicable laws. Filing 55 at 9 (¶ 21).

There are several Related Entities with relationships to the Operators and each other that might fairly be described as labyrinthine. *See* Filing 58-2 (organizational chart).[6] The Court will not attempt to navigate all those relationships. It is enough for now to point out some of the relationships. For example, the Operators and the Related Entities share officers, members, and principal office addresses. Filing 55 at 11 (¶ 43). Dennis Langley was formerly the principal of AltEn and various entities including a Related Entity called Earth Energy & Environment, LLC (E3). Filing 55 at 11 (¶ 44). E3 is an entity with ownership similar to that of the Operators and the other Related Entities. Case No. 8:22-cv-00071, Filing 1, Complaint (¶ 8). Tanner Shaw, Langley's stepson, took over positions in multiple entities following Langley's death in June 2017. Filing 55 at 11 (¶ 44). As relevant for present purposes, Shaw has executed multiple documents over the last two years, including contracts and financial agreements, as an officer of multiple entities, including the Operators and the Related Entities. Filing 55 at 12 (¶ 51). The Operators contend that they have separate bank accounts, separate federal identification numbers, and separate financial books and records. Filing 87 at 3 (¶ 3). They also assert that the entities other than E3's wholly owned companies—specifically, Green Disposal and Mead Cattle—filed separate tax returns. Filing 87 at 3 (¶ 4). The Operators also contend that Mead Cattle had a separate manager for the feed lot who had no responsibilities or authority with respect to the operation of the AltEn ethanol plant. Filing 87 at 3 (¶ 5).

---

[6] The Seed Companies identify the Related Entities as Earth Energy & Environment, LLC (E3); AltEn Operating Company (AltEn Op Co); Greencycle Solutions (Greencycle); Integrated Recycling, LLC (Integrated); E3 Biofuels, LLC; Falcon Energy LLC; and Mead Acquisition Company, LLC. Filing 55 at 2. E3 Biofuels, LLC, which is identified as a Related Entity, is wholly owned by E3. E3 Biofuels, LLC, also has a minor percentage ownership (but no voting rights) in AltEn, LLC. Filing 58-2. The organizational chart also shows that Platte River Green Fuels, LLC, an Operator, has the other ownership interest (and 100% voting rights) in AltEn, LLC.

2. *The Shutdown of Operations and the Remediation Activities*

The ethanol production facility was not a success. The Seed Companies allege that AltEn was insolvent as of December 2016. Filing 55 at 12 (¶ 56). As the Seed Companies allege—and the Operators nowhere dispute—the United States Environmental Protection Agency (US EPA) and the Nebraska Department of Environment and Energy (NDEE) became involved:

> On September 23, 2019, NDEE issued a Notice of Violation to AltEn for waste disposal violations, including operating a solid waste management facility on its property without a permit. NDEE prohibited AltEn from stockpiling the wet cake onsite and required disposal of the wet cake at a permitted solid waste management facility. On February 1, 2021, NDEE conducted a site visit and inspected three lagoons (West, Northeast, and Southeast Lagoons) at the AltEn Facility. The lagoons were used to hold approximately 180 million gallons of wastewater from AltEn's, Mead Cattle's, and Green Disposal's manufacturing processes. On February 4, 2021, NDEE issued a Complaint and Order requiring AltEn to immediately cease discharge of industrial wastewater into its wastewater lagoons. On February 8, 2021, the AltEn Facility was shutdown. On February 12, 2021, a massive discharge from the AltEn Facility occurred, spilling a significant volume of waste materials onto and off AltEn's property as far as 4.5 miles. On February 17, 2021, the NDEE issued a letter of non-compliance to AltEn, instructing AltEn to undertake efforts to stabilize and remediate. NDEE then issued an Emergency Order and Complaint requiring AltEn's immediate action to mitigate the discharge. On March 1, 2021, the State of Nebraska filed a Complaint against AltEn in the District Court of Saunders County, Nebraska, Case No. CI21-36, for violating the Emergency Order and for violations of the Nebraska Environmental Protection Act ("NEPA"), the Integrated Solid Waste Management Act ("ISWMA"), and permit conditions.

Filing 55 at 5–6 (¶¶ 1–7) (internal citations and paragraph numbers omitted).

The State of Nebraska explains that it alleged in its state court lawsuit among other things that AltEn placed wastes in a location that caused or was likely to cause land and water pollution. Filing 93 at 3 (citing State Complaint at ¶¶ 199–220). The State also clarifies that most of the violations alleged in the State's Complaint stem from AltEn's use of discarded treated seed as feedstock for ethanol production. Filing 93 at 3 (citing State Complaint, ¶¶ 56–60). As the State explains,

9

> AltEn's use of discarded treated seed for ethanol production generated wastes—wastewater and wet cake (or distiller's grain)—that contain elevated concentrations of pesticides. State Complaint, ¶¶ 60, 74, 100, 116. Lab results show the concentrations in these wastes exceed registered application rates for products containing pesticides and also exceed ecological and/or human health benchmarks created by the U.S. Environmental Protection Agency ("EPA"). *See* State Complaint, ¶¶ 60, 73-74, 86, 140; ECF No. 83-1 (Attachment 2 (EPA Ecological and Human Health Benchmarks) to Fact Sheet for Industrial Storm Water NPDES Permit No. NE0139882 (December 29, 2022)).

Filing 93 at 3–4 (footnotes omitted).

The Seed Companies voluntarily formed the AltEn Facility Response Group (AFRG or FRG in the parties' and *amicus*'s submissions) to stabilize environmental conditions at the AltEn site that were necessitated by the Operators' improper and unlawful actions. Filing 55 at 6 (¶ 9); Filing 55 at 2–3 (alleging that the US EPA and NDEE "encouraged" the Seed Companies to address the immediate environmental concerns at the site). The Seed Companies entered into a Memorandum of Agreement with the NDEE memorializing the Seed Companies' participation in the Nebraska Voluntary Cleanup Program (VCP). Filing 55 at 6 (¶ 10); Filing 57-1 (Memorandum of Agreement between the NDEE and the members of the FRG). Certain items set out in the remedial action plan (RAP) that the FRG set up with the NDEE have been addressed, and the FRG has taken additional steps to stabilize and remediate the AltEn site. Filing 55 at 7 (¶ 13–14); Filing 93 at 4 (providing a similar description of the Seed Companies' involvement). The Seed Companies allege that to date they have expended $27,896,473 in their efforts to stabilize and remediate the AltEn site. Filing 55 at 7 (¶ 15). The State adds that the Seed Companies are working on final measures for remediation of pollution at the AltEn site but have not yet committed to conducting full remediation of the pollution. Filing 93 at 4.

The State also adds that AltEn has not conducted any substantial remediation measures on or off the AltEn site since at least June 2021. Filing 93 at 5. On the other hand, the State acknowledges that AltEn has performed some activities, such as quarterly groundwater

10

monitoring, as required by an applicable permit, and the preparation of a Step 6/Step 7 Work Plan to determine the presence and/or extent of pollution on and off the AltEn site. Filing 93 at 5. On July 1, 2022, the NDEE renewed AltEn's permit to perform quarterly groundwater monitoring at four monitoring wells around the lagoons at the AltEn site as well as an updated Ground Water Monitoring Plan. Filing 93 at 5. The State explains that quarterly groundwater monitoring yields important information that NDEE uses to monitor the presence of and changes in pesticides in the groundwater. Filing 93 at 6. On February 23, 2022, AltEn also entered into a Consent Order with NDEE in administrative proceedings before the NDEE, which among other things requires AltEn to submit a Step 6/Step 7 site assessment work plan; notes that AltEn has applied for a new permit and must ensure that it has a valid permit at all times; prohibits AltEn from resuming commercial and industrial operations of producing ethanol without notification by NDEE that it may do so without further threat of harm to public health and the environment; and requires continued cooperation with FRG's clean-up efforts. Filing 93 at 6 (citing Filing 83-3). NDEE also issued AltEn an individual industrial storm water permit on December 29, 2022. Filing 93 at 7.

### 3.   *The Operators' Post-Shutdown Financial Transactions*

Following the AltEn Facility shutdown, Shaw entered into an asset purchase agreement on behalf of Mead Cattle to sell Mead Cattle's assets and land to Champion Feeders, LLC, (Champion), effective July 1, 2021. Filing 55 at 9 (¶ 22). Shaw stated in his deposition that the proceeds from the asset and land sale of Mead Cattle to Champion were never held in AltEn's account but were instead held in either the Mead Cattle account or an account of E3, a Related Entity. Filing 55 at 9 (¶ 24). Financial records that the Operators produced on November 10, 2022, indicate that proceeds from the sale of Mead Cattle in the amount of $2,640,000.00 were deposited into a checking account at Wells Fargo Bank, ending in x7958, owned by E3. Filing 55 at 9 (¶ 25); *see also* Filing 58-11 at 2 (E3 account x7958 statement 7/31/21); Filing 58-12 at 2 (E3 Wells Fargo

account check register). On August 5, 2022, Shaw executed a "Joint Release Instruction/Flow of Funds Memorandum" as President of Mead Cattle Company, LLC, instructing that escrow funds of $120,000.00 be wired to the E3 bank account. Filing 55 at 9 (¶ 27); *see also* Filing 58-14 at 4 (escrow release). Thus, additional escrow funds from the sale of Mead Cattle to Champion were also remitted to the E3 Bank Account. Filing 55 at 9 (¶ 26). According to the Operators, the sale of the Mead Cattle assets to Champion in July 2021, was "arms-length," some of the proceeds were paid to a secured lender, and the remainder of the proceeds ($2,055,511.62) and the escrow payment were distributed to E3, Mead Cattle's owner, as a return to member of capital. Filing 87 at 3 (¶ 6).

The Seed Companies contend, and the Operators do not dispute, that nearly all the cash assets available to the Operators are located in the E3 bank account. Filing 55 at 9 (¶ 28); *see also* Filing 56 at 4 (Barberich Aff. at ¶ 18). In fact, the Operators admit that E3 has provided the funds necessary for them to continue operations and to defend this litigation and other Nebraska state court lawsuits. Filing 87 at 4 (¶ 14). Thus, they contend that if the assets of E3 and the Operators are frozen, they will be unable to pay their continuing obligations for litigation and regulatory requirements. Filing 87 at 4 (¶ 15).

The Seed Companies have shown that E3 is dissipating available cash assets by making cash transfers to AltEn Operating Company, a Related Entity, which in turn is being utilized to pay for all of AltEn, LLC's expenses, including professional fees (legal and accounting), payroll and employee benefits, consultants, bank charges, and vendors. Filing 55 at 10 (¶ 30). The Operators assert that E3's Wells Fargo bank account was opened in South Dakota and that the primary Wells Fargo contact for that account is located in Arizona. Filing 87 at 5 (¶ 19). They assert that certain Bank of America accounts identified by the Seed Companies as belonging to the Operators or Related Entities are "considered" Texas bank accounts. Filing 87 at 5 (¶ 20).

Wherever the E3 bank account is located, the financial transactions between the Operators and E3 and the Operators' admission that the cash assets available to the Operators are located in the E3 bank account demonstrate that E3 was in active concert or participation with the Operators.

Shaw's 2022 salary is $195,000.00 per year, which he approved in his capacity as an officer of multiple entities, including the Operators. Filing 55 at 10 (¶ 33). The Seed Companies understood that Shaw's salary and the salaries of other individuals are paid by AltEn Operating Company even though the NDEE shut down AltEn's ethanol plant in 2021. Filing 55 at 10 (¶ 34). On the other hand, the Operators state that Tanner Shaw's salary is paid by E3 Operating Company, LLC. Filing 87 at 4 (¶ 8). At the preliminary injunction hearing, the Operators' counsel clarified that E3 pays AltEn Operating Company, which then pays the controller, plant manager, and human resources and regulatory manager for AltEn, and that E3 pays Shaw. Shaw testified that the Operators did not have employees, because AltEn Operating Company employed the Operators' staff, although Shaw was not sure if this was true of Mead Cattle, where Mead Cattle is owned by E3. Filing 55 at 10 (¶ 35) (stating that Mead Cattle is "a part of E3 Operating Company"); *but see* 58-2 (showing that Mead Cattle is wholly owned by E3, which also wholly owns AltEn Operating Company, making Mead Cattle a sister company of AltEn Operating Company not a part of AltEn Operating Company or E3 Operatory Company).

The Operators point out that there are three persons employed by AltEn Operating Company for operations at AltEn, LLC—Dale Gray (controller), Scott Tingelhoff (plant manager), and Mary Tingelhoff (human resources and regulatory). Filing 87 at 3–4 (¶ 8). The Operators contend that without the services of these employees and Tanner Shaw, the Operators could not defend themselves in this litigation and other Nebraska state court lawsuits, and the Operators would be unable to collect the information and documents required to respond to discovery requests. Filing 87 at 4 (¶ 9). The Operators also contend that without these employees, the

Operators would be unable to track their expenses, prepare financial statements, file tax returns, seek refunds from the State of Nebraska under the Nebraska Advantage Act, seek a refund from the Bureau of Alcohol, Tobacco, and Firearms for a cash bond, comply with permit requirements for permits necessary for the FRG to conduct remediation activities, or comply with requirements imposed by the NDEE. Filing 87 at 4 (¶ 10). The financial transactions between the Operators and AltEn Operating Company demonstrate that AltEn Operating Company was in active concert or participation with the Operators.

Shaw admitted that the cash draw each month over the last year for the Operators was a hundred thousand dollars plus or minus, depending on what was going on with the legal matters. Filing 55 at 10 (¶ 36). The Seed Companies estimate the average monthly "cash burn" rate over the last year at approximately $136,299.00, which increases to $158,380.00 when considering transfers from E3 to other entities such as E3 Operating Company and E3 Patent HoldCo. Filing 55 at 10 (¶ 37). As a result, as of mid-December 2022, the Seed Companies estimated that the cash assets held in the E3 bank account will be available only for somewhere between the next 10.01 months and 11.34 months. Filing 55 at 10 (¶ 38). As of October 2022, the available cash assets had decreased to $1,796,578.39. Filing 55 at 11 (¶ 39).

According to Shaw, the proceeds of two auctions in 2021 of equipment no longer needed at the ethanol plant yielded proceeds of something less than a million dollars, which went into AltEn's receivables. Filing 55 at 11 (¶ 40). The Operators contend that the auction of AltEn's equipment occurred only after Scott Tingelhoff met with the Seed Companies' on-site contractor and confirmed that none of that equipment was needed for remediation activities. Filing 87 at 5 (¶ 16). AltEn's financial records for Fiscal Year 2021 show that the value of inventory decreased from $529,232.45 in January 2021 to $2,195.70 in December 2021. Filing 55 at 10 (¶ 41). The

Seed Companies maintain that saleable property remains at the AltEn Facility, however. Filing 55 at 11 (¶ 42).

The Seed Companies have identified what they call three "non-payroll transfers" from the E3 bank account to AltEn, Mead Cattle, and AltEn Operating Company totaling $264,726. Filing 55 at 10 (¶ 31); Filing 56 at 4 (Berberich Aff. at ¶ 25); Filing 56-4 (chart). They have also identified what they call transactions "outside of ordinary business" consisting of Mead Cattle's payment of $146,612 in the first quarter of 2022 related to the replacement of three checks dated December 2016 and May 2017,[7] and AltEn, LLC's exchange of equipment with a third-party, Water Engineering, Inc., to satisfy several years' worth of outstanding invoices. Filing 55 at 10 (¶ 32). The Operators allege that AltEn's sale of certain laboratory equipment to Water Engineering, Inc., on or about November 1, 2021, was in exchange for complete satisfaction of AltEn's outstanding account balance with that company. Filing 87 at 5 (¶ 18).

## B. Procedural Background

The Seed Companies instituted the lead case with Pioneer as lead plaintiff by filing a Complaint on February 22, 2022. Filing 1. Syngenta's Complaint in Case No. 8:22cv71 was filed the same day, while Bayer's Complaint in Case No. 8:22cv82 followed on March 2, 2022. The Seed Companies bring a plethora of claims, both legal and equitable, in the lead case.[8] After

---

[7] Berberich's affidavit does not indicate to whom the three checks were paid. Filing 56 at 5 (¶ 26(a)).

[8] Specifically, Count I, II, and III allege breach of contract claims by Pioneer, AgReliant, and Beck's against AltEn, respectively. Filing 1 at 21–25 (¶¶ 106–125). Counts IV and V allege breach of contract claims based on contractual indemnity by Pioneer and AgReliant against AltEn, respectively. Filing 1 at 25–27 (¶¶ 126–138). Count VI seeks declaratory and injunctive relief on voidable transfers by AltEn, Mead Cattle, and Green Disposal pursuant to the Nebraska Uniform Voidable Transactions Act (UVTA), Neb. Rev. Stat. § 36-801 to § 36-815. Filing 1 at 27–20 (¶¶ 139–152). Count VII alleges a claim of common law indemnity by all plaintiffs in that action against all defendants in that action. Filing 1 at 29–30 (¶¶ 153–155). Count VIII alleges a claim for contribution by all plaintiffs in that action against all defendants in that action. Filing 1 at 30 (¶¶ 156–158). Count IX alleges a claim of equitable subrogation by all plaintiffs in that action against all defendants in that action. Filing 1 at 30–31 (¶¶ 159–162). Count X alleges a claim of unjust enrichment by all plaintiffs in that action against all defendants in that action. Filing 1 at 31–32 (¶¶ 163–167). Count XI alleges a claim of fraud in the inducement by Winfield against all defendants. Filing 1 at 32–33 (¶¶ 168–172). Count XII alleges a claim of promissory estoppel by Winfield against all defendants. Filing 1

various extensions of deadlines for answers to be filed, the Operators in the lead case filed a joint

Answer on December 15, 2022. Filing 54.[9]

Just a day before the Operators filed their Answers, the Seed Companies filed their Joint

Motion for Preliminary Injunction and Order of Immediate Attachment Pursuant to Fed. R. Civ.

P. 65(a), 64(a)–(b), and Neb. Rev. Stat. § 25-1001 *et seq*. Filing 51. While the parties were briefing

that Joint Motion, the State of Nebraska was granted leave to file an *amicus curiae* brief. Filing

93. The Court held an evidentiary hearing, consisting of the submission of exhibits and affidavits

and the presentation of oral argument, on February 3, 2023. Counsel for the Seed Companies and

the Operators participated in the hearing, but *amicus curiae* the State of Nebraska did not.

## II. LEGAL ANALYSIS

### A. The Requested and Available Relief

As indicated by the title of the Joint Motion, the Seed Companies seek relief pursuant to

Rule 65 and Rule 64 of the Federal Rules of Civil Procedure and a Nebraska attachment statute,

apparently all together but possibly separately. The Operators contend that some of the relief

sought simply is not available in an action like this. Thus, the threshold issues the Court must

resolve are what relief is requested and what relief, if any, is available in a case such as this.

*1.     The Parties' Arguments*

In their opening brief, the Seed Companies offer a reasonably detailed explication of why

they believe that they are entitled to preliminary injunctive relief enjoining the Operators, the

---

at 33–34 (¶¶ 173–179). The cases involving Syngenta and Bayer, which involve similar claims, were consolidated with Pioneer's case with Pioneer's case as the lead case on April 18, 2022. Filing 32.

Similarly, Syngenta's claims in Case No. 8:22cv71 are for breach of contract, breach of warranty, contractual indemnity, common law indemnity, common law contribution, equitable subrogation, unjust enrichment, negligence, and declaratory judgment. Bayer's claims in Case No. 8:22cv82 are for breach of contract, contractual indemnity, voidable transactions, common law indemnity, contribution, equitable subrogation, unjust enrichment, and fraudulent misrepresentation.

[9] The Operators filed a joint Answer in Syngenta's case and Bayer's case the same day.

16

Related Entities, and their officers, parents, subsidiaries, and/or affiliates from further dissipating assets during the pendency of this lawsuit. Filing 55 at 14–19. They then offer a one-page argument that they are entitled to an immediate order of attachment because the Operators, the Related Entities, and their officers, parents, subsidiaries and/or affiliates have already "assigned, removed or disposed" of property and will continue to do so. Filing 55 at 19–20.[10]

The Operators respond that the relief the Seed Companies seek is not authorized under federal or Nebraska law. Filing 87 at 5. They contend that, absent some authorizing statute, federal district courts lack authority to issue a preliminary injunction preventing a defendant from transferring assets in which no lien or equitable interest is claimed, citing *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 333 (1999). Filing 87 at 5. They argue that some federal Circuit Courts of Appeals have also concluded that district courts lack general equitable authority to enter a preliminary injunction freezing a defendant's assets when only an award of monetary damages is sought. Filing 87 at 6. Next, they contend that Nebraska law prohibits a plaintiff from enjoining a defendant's property absent a lien prior to reducing their claims to judgment. Filing 87 at 6. They argue that it is clear that the remedy the Seed Companies ultimately seek is a monetary judgment, but they point out that the Seed Companies cite no specific statutory provision authorizing a preliminary injunction in their favor. Filing 87 at 7. The Operators argue that the relief the Seed Companies seek is only available, if at all, by attachment pursuant to Rule 64 and Neb. Rev. Stat. §§ 25-1001 *et seq.* Filing 87 at 8.[11] One threshold impediment to any such relief, they contend, is that this Court lacks jurisdiction to attach property (which is essentially

---

[10] The appearance of the Seed Companies' attachment argument constituting an afterthought is reinforced by the Seed Companies' reliance on Neb. Rev. Stat. § 25-1001(6) as the basis for attachment under Nebraska law in this case, while quoting "assigned, removed or disposed of" language that appears only in Neb. Rev. Stat. § 25-1001(7). Filing 55 at 19.

[11] The Operators argue elsewhere in their brief that the Seed Companies have not shown that they are entitled to a prejudgment attachment, either. Filing 87 at 23–30.

an *in rem* action) that is outside the State of Nebraska, such as the Wells Fargo and Bank of America accounts identified by the Seed Companies. Filing 87 at 24–25.

In reply, the Seed Companies argue that the Court has the power to enter a preliminary injunction because they have pleaded both equitable and legal claims and seek both equitable and legal relief. Filing 90 at 11. They also argue that the Operators' reading of *Grupo Mexicano* is overly broad. Filing 90 at 11. They contend that courts have distinguished *Grupo Mexicano* when there is a claim for more than monetary relief, as they contend there is here. Filing 90 at 12. The Seed Companies argue that because this case is a mix of legal and equitable claims, with a strong public interest, and because the requested relief is a reasonable measure to preserve the status quo, this Court has authority to enter a preliminary injunction to enjoin the Operators from transferring, selling, moving, or otherwise concealing assets. Filing 90 at 13. Finally, as to attachment, the Seed Companies argue that the situs of intangible property, such as accounts receivable, debts, or bank accounts, is the domicile of the owner, and the domicile of the Operators includes where they conduct business activities—here, Nebraska. Filing 90 at 13–14. The Seed Companies also argue that the Operators offer only conclusory statements not any evidence that the situs of the bank accounts at issue is not Nebraska. Filing 90 at 14.

2. *The Seed Companies Seek Available Preliminary Injunctive Relief on Equitable Claims*

The Court begins its analysis of threshold issues by examining what relief the Seed Companies seek in their Joint Motion and on what claims. The parties have used a variety of words to describe the order the Seed Companies seek to prevent dissipation of the Operators' assets in their Joint Motion, including "preliminary injunction," "attachment," and "freeze." *See, e.g.,* Filing 55 at 2 (describing the relief sought as "a preliminary injunction and prejudgment attachment of all cash assets and real/personal property owned by" the Operators); Filing 87 at 1 (referring to "entry of a preliminary injunction to 'enjoin and attach any cash assets or personal/real property'");

Filing 87 at 6 (referring to "a preliminary injunction freezing a defendant's assets"); *see also* Filing 87 at 21 (referring to an "asset freeze").

Rule 65 of the Federal Rules of Civil Procedure authorizes courts to issue preliminary injunctions. Fed. R. Civ. P. 65(a). As the Supreme Court has explained, "In the case of the usual preliminary injunction, the plaintiff seeks to enjoin, pending the outcome of the litigation, action that he claims is unlawful." *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc*., 527 U.S. 308, 314 (1999). Indeed, Rule 65(d) provides that a preliminary injunction or restraining order must "describe in reasonable detail—and not by referring to the complaint or other document— the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(C). It follows that to restrain acts a preliminary injunction must necessarily direct an actor to do or not to do the acts. In contrast, Rule 64 of the Federal Rules of Civil Procedure provides for seizing a person or property by providing that "[a]t the commencement of and throughout an action, every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment. But a federal statute governs to the extent it applies." Fed. R. Civ. P. 64(a). Rule 64 specifically identifies "attachment" under state law as an available remedy. Fed. R. Civ. P. 64(b). Thus, as the First Circuit Court of Appeals succinctly explained, "Even though a freeze order [pursuant to Rule 65] may serve many of the same ends as an attachment [pursuant to Rule 64], the former acts upon a party whereas the latter is directed at specific property." *Charlesbank Equity Fund II v. Blinds To Go, Inc*., 370 F.3d 151, 161 (1st Cir. 2004).

In their Joint Motion, the Seed Companies first seek an order restraining the Operators and the Related Entities from taking certain action. Specifically, they seek an order:

> 1.  Enjoining all corporate Defendants and their parents, subsidiaries and/or affiliates (the Defendant Entities), including Earth Energy & Environment, LLC; AltEn Operating Company, E3; Greencycle Solutions; Integrated Recycling, LLC; E3 Biofuels, LLC; Falcon Energy

19

> LLC; and Mead Acquisition Company, LLC (the "Related Entities"), and any agent, servant, employee, attorneys-in-fact, or other persons in concert or active participation with them, from transferring, selling, moving, or otherwise concealing any and all cash funds, assets, or any real and personal property currently belonging to Defendant Entities and Related Entities, including any such assets that may be obtained by the Defendant Entities or the Related Entities in the future.

Filing 51 at 3 (¶ 1). Such relief directed at action of legal persons would constitute a "usual" preliminary injunction under Rule 65. *See Grupo Mexicano*, 527 U.S. at 314; *Charlesbank Equity Fund II*, 370 F.3d at 161.

The Seed Companies then muddy the waters by seeking an order also:

> 2.      Attaching any and all real property currently owned by any of the Defendant Entities or Related Entities;

> 3.      Attaching any and all personal property, equipment, fixtures, structures, or appurtenances located at or upon any and all real property owned by Defendant Entities or Related Entities, including 1344 County Road 10, Mead, Nebraska 68041;

> 4.      Attaching any and all cash funds currently held in the possession of any of the Defendant Entities and Related Entities, including the E3 Wells Fargo bank account ending x7958, and ordering that none of the Defendant Entities or Related Entities may remove, transfer, assign or otherwise dispose of said funds during the pendency of this action[.]

Filing 51 at 3 (¶¶ 2–4). This relief is directed at property—specifically, seizing property by attachment—that would fall under Rule 64. *Charlesbank Equity Fund II*, 370 F.3d at 161.

The Operators argue that the Seed Companies cannot obtain relief pursuant to Rule 65. They contend that, the Supreme Court held in *Grupo Mexicano* that, absent some authorizing statute, federal district courts lack authority to issue a preliminary injunction preventing a defendant from transferring assets in which no lien or equitable interest is claimed. Filing 87 at 5 (citing *Grupo Mexicano*, 527 U.S. at 333). In *Grupo Mexicano*, the question before the Supreme Court was "whether, in an action for money damages, a United States District Court has the power to issue a preliminary injunction preventing the defendant from transferring assets in which no lien

or equitable interest is claimed." 527 U.S. at 310. The Supreme Court ultimately held that "the District Court had no authority to issue a preliminary injunction preventing petitioners from disposing of their assets pending adjudication of respondents' contract claim for money damages." *Id.* at 333. The Court also stated that an "all-purpose" preliminary injunction that allowed a creditor to freeze a debtor's assets before obtaining judgment on a legal claim "could render Federal Rule of Civil Procedure 64, which authorizes the use of state prejudgment remedies, a virtual irrelevance." *Id.* at 330; *see also Rosen v. Cascade Int'l, Inc.*, 21 F.3d 1520, 1529 (11th Cir. 1994) ("[W]e hold that the district court lacked the general equitable authority in this case to freeze Moses' assets pending trial where the shareholder appellees sought only the award of monetary damages—and not equitable relief—for fraud under federal securities laws and state common law."); *Mitsubishi Int'l Corp. v. Cardinal Textile Sales, Inc.*, 14 F.3d 1507, 1521–22 (11th Cir. 1994) (concluding in an action for money damages "that Rule 64, and not Rule 65 (which governs injunctions generally), provides the standard for evaluating a request for preliminary injunctive relief that is, in reality, no more than a request for prejudgment attachment.").

The Operators argue that, because "[p]lainly, the gravamen of the Plaintiffs' Complaints is a request for monetary damages," then "*Grupo Mexicano* clearly precludes the Seed Companies from obtaining a preliminary injunction solely for purposes of preserving their rights to collect a potential future monetary judgment." Filing 87 at 7. Yet, the obvious limitation set out in *Grupo Mexicano* was that there was no authority for "a preliminary injunction preventing petitioners from disposing of their assets pending adjudication of respondents' contract claim for money damages." 527 U.S. at 333. The Eighth Circuit Court of Appeals has pointed out that in *Grupo Mexicano*, the Court "distinguished cases in which the underlying suit was for equitable relief, rather than damages." *Kennedy Bldg. Assocs. v. CBS Corp.*, 476 F.3d 530, 535 (8th Cir. 2007) (citing *Grupo Mexicano*, 527 U.S. at 324–25). Further, the holding in *Grupo Mexicano* was in the context of a

contract claim for money damages where the claimant had "no lien or equitable interest." 527 U.S. at 310.

Although the Seed Companies do seek money damages on claims of breach of contract, they also assert equitable claims or claims for relief in equity, including injunctive relief. Filing 90 at 11. In other words, they assert that they do have an "equitable interest" in the assets in question, as well as claims for equitable relief. *See Grupo Mexicano*, 527 U.S. at 310, 333; *Kennedy Bldg. Assocs.,* 476 F.3d at 535. They identify their equitable claims as claims under the UVTA and claims of equitable subrogation, unjust enrichment, fraudulent inducement, and fraudulent misrepresentation. Filing 90 at 12.

The Court does not agree that all these claims are either equitable or seek any relief in equity. The equitable relief set out in the Relief Requested portion of the Complaint is limited. *See* Filing 1 at 34. Such relief includes a request for a declaration that all transfers of the Operators' assets after February 2021 for less than reasonably equivalent value are void under Nebraska law. Filing 1 at 34 (¶ 2). That relief can only relate to the UVTA claim, not more broadly to other claims. *See* Neb. Rev. Stat. § 36-805(a)(2). The injunctive relief sought relates only to preventing the transfer of assets "during the pendency of this action," so it is not ultimate equitable relief. Filing 90 at 34 (¶ 3). The Court considers a formulaic "catchall prayer" for "[a]ll further legal and equitable relief as the Court may deem just and proper," as in Filing 1 at 34 (¶ 5), to be inadequate to make the action as a whole one for "equitable relief." Thus, the prayer for relief in the Complaint does not establish that the holding in *Grupo Mexicano* is inapplicable to the Seed Companies' action. *See Grupo Mexicano*, 527 U.S. at 310, 333; *Kennedy Bldg. Assocs.*, 476 F.3d at 535.

On the other hand, some claims asserted by the Seed Companies are truly equitable, seek equitable relief, and even claim an equitable right in the Operators' assets. *See Grupo Mexicano*, 527 U.S. at 310, 333. Specifically, in Counts IX and X in Pioneer's case, the Seed Companies

assert equitable claims of subrogation and unjust enrichment, on which they seek injunctive and other equitable relief. In Count IX (equitable subrogation), the Seed Companies assert that they "are entitled to assert a right of subrogation against one or more of the Defendants in an amount to be proven at trial related to sums paid by Pioneer, Corteva, Beck's, AgReliant, and Winfield to clean up the AltEn Facility, plus any additional damages Pioneer, Corteva, Beck's, AgReliant, and Winfield may suffer in the future." Filing 1 at 31 (¶ 162). In Count X (unjust enrichment), the Seed Companies assert that they "conferred a benefit upon Defendants because Defendants have been able to profit from Pioneer's, Corteva's, Beck's, AgReliant's, and Winfield's efforts and to avoid contributing to cleanup costs caused by Defendants' actions," Filing 1 at 31 (¶ 164); that "[i]t would be inequitable for Defendants to retain these benefits without properly compensating Pioneer, Corteva, Winfield and Beck's for the costs they have incurred to respond to conditions Defendants created and stabilize the AltEn Facility," Filing 1 at 32 (¶ 166); and that "[o]ne or more of the Defendants in justice and fairness should compensate Pioneer, Corteva, Beck's, AgReliant, and Winfield for the sums paid by Pioneer, Corteva, Beck's, AgReliant, and Winfield paid to address the environmental conditions created at the AltEn Facility." Filing 1 at 32 (¶ 167). Thus, these equitable claims take the Seed Companies' action for preliminary injunctive relief outside the prohibition in *Grupo Mexicano*. *See Grupo Mexicano*, 527 U.S. at 310, 333; *Kennedy Bldg. Assocs.*, 476 F.3d at 535.

The Seed Companies have also asserted that the Nebraska Uniform Voidable Transactions Act (Nebraska UVTA) provides for pre-judgment injunctive relief against further dissipation of assets. In *Kennedy Building Associates*, the Eighth Circuit Court of Appeals pointed out that the Supreme Court in *Grupo Mexicano* had also distinguished "cases in which a statute authorized injunctions 'necessary or appropriate for the enforcement' of the statute." 476 F.3d at 535 (citing *Grupo Mexicano*, 527 U.S. at 325-26). In Pioneer's case, the Seed Companies assert a claim in

Count VI against the Operators, including Tanner Shaw, under the Nebraska UVTA, on which they "seek an injunction against AltEn, Mead Cattle, Green Disposal, Shaw, and Platte River Green Fuels prohibiting further dispositions of any assets transferred or of other property pursuant to Neb. Rev. Stat. § 36-808(a)(3)(i)." Filing 1 at 29 (¶ 152). Thus, contrary to the Operators' contention, the Seed Companies do seek injunctive relief authorized as appropriate enforcement under the Nebraska UVTA. Furthermore, the Nebraska Supreme Court explained that an action under the Nebraska Uniform Fraudulent Transfer Act (UFTA), the predecessor to the UVTA, was equitable in nature. *Korth v. Luther*, 935 N.W.2d 220, 236 (Neb. 2019). Because the Court finds only non-substantive differences between the relevant provisions of the UFTA and the UVTA, the Court concludes that an action pursuant to the UVTA is also equitable, so that preliminary injunctive relief is available on a UVTA claim on this ground as well. *See Grupo Mexicano*, 527 U.S. at 310, 333; *Kennedy Bldg. Assocs.*, 476 F.3d at 535.[12]

The Court concludes that a preliminary injunction to prevent the Operators from dissipating their assets—a freeze order, one might say—directed at the Operators and prohibiting certain acts is an available remedy on their UVTA claim (authorized by the underlying statute) and their equitable claims for subrogation and unjust enrichment. Consequently, the Court will consider the Seed Companies' request for such a preliminary injunction.

### 3. Attachment Is Both Likely Unavailable and Unnecessary

In contrast to the availability of preliminary injunctive relief, the availability of pre-judgment attachment pursuant to Rule 64 of the Federal Rules of Civil Procedure and Neb. Rev. Stat. §§ 25-1001 *et seq.* in this case is doubtful. The Court is not convinced that the Seed

---

[12] Similarly, Bayer also asserts a UVTA claim for equitable injunctive relief (Count III), equitable subrogation (Count VI), unjust enrichment (Count VII), and Fraudulent Misrepresentation (Count VII). Syngenta asserts claims of equitable subrogation (Count VI) and unjust enrichment (Count VII). Thus, *Grupo Mexicano* does not bar preliminary injunctive relief preventing the Operators from dissipating their assets pending a judgment on such equitable claims.

24

Companies could meet certain requirements for attachment. Furthermore, the Court concludes that attachment is simply unnecessary and cumulative relief in this case.

In their briefing, the Seed Companies state that they are relying on Neb. Rev. Stat. § 25-1001(6) as their ground for attachment. Filing 55 at 19. Section 25-1001(6) provides that a court may order a pre-judgment attachment against the property of the defendant "when the defendant or one of several defendants . . . (6) has property, or rights, in action, which he or she conceals." The Seed Companies argue that the Operators "concealed" assets because they did not disclose that the E3 account held the majority of their assets until after the October 27, 2022, Rule 30(b)(6) deposition of Shaw and after the Operators had made various undisclosed transfers from that account prior to that date. Filing 55 at 20; *see also* Filing 90 at 15 (doubling down on the timing of the disclosure). The Operators dispute this timing of the disclosure, however, asserting that it occurred in April of 2022. Filing 87 at 28. This dispute about "concealment," which necessarily involves "intent to conceal," is more appropriately determined by a factfinder on a complete record than it is a dispute to be decided on a preliminary record, particularly if it appears unnecessary to do so. *Cf. LG & E Cap. Corp. v. Tenaska VI, L.P.*, 289 F.3d 1059, 1069 n.4 (8th Cir. 2002) ("Estoppel in this instance requires proof of knowledge *and* intent, both of which are issues of fact more appropriately left for the fact finder in this instance." (emphasis in the original)).

In their briefing, the provision of the Nebraska attachment statute that the Seed Companies quote is not § 25-1001(6) on which they purportedly rely, but § 25-1001(7). Filing 55 at 19. The Seed Companies argue that the Operators "have already 'assigned, removed or disposed' of property and will continue to do so." Filing 55 at 19 (recast without capitalization). The provision they quote states that a court may order a pre-judgment attachment against the property of the defendant "when the defendant or one of several defendants . . . (7) has assigned, removed or disposed of, or is about to dispose of his or her property, or a part thereof, with the intent to defraud

25

his or her creditors." Filing 55 at 19. Thus, § 25-1001(7) requires that the claimant must show that the defendant made transfers "with the intent to defraud his or her creditors." In their opening brief, the Seed Companies discuss transfers of assets out of the E3 account, but they never discuss the "intent to defraud" requirement in relation to attachment. Filing 55 at 19. On the other hand, the Operators offer arguments concerning the lack of "intent to defraud" in their brief, focusing on the at least arguable legitimacy of the transactions. *See* Filing 87 at 29–30. The Seed Companies do not reply to these arguments to try to show "intent to defraud." Under these circumstances, the Court concludes that the Seed Companies have waived reliance on § 25-1001(7), at least for purposes of their Joint Motion for preliminary relief. *See United States v. Cooper*, 990 F.3d 576, 583 (8th Cir. 2021) ("Ordinarily, a party's failure to make an argument in its opening brief results in waiver of that argument.").

In their reply brief and at the preliminary injunction hearing, the Seed Companies argued that the defendants are about to convert property or assets for the purpose of placing it beyond the reach of creditors. *See, e.g.,* Filing 90 at 15 ("Plaintiffs have showed by a preponderance of the evidence that Defendants have concealed assets to place them out of reach of their creditors and the Court."). The prohibition on such conduct comes from Neb. Rev. Stat. § 25-1001(5), which permits attachment "when the defendant or one of several defendants . . . is about to convert his or her property, or a part thereof, into money, for the purpose of placing it beyond the reach of his or her creditors." Reliance on § 25-1001(5) is inappropriate here. Success on such an argument is doubtful at this stage of the proceedings, because it also relies on demonstrating intent or purpose—here, intent to place property beyond the reach of creditors—that is more appropriately determined by a factfinder on a complete record than it is a dispute to be decided on a preliminary record, particularly if it appears unnecessary to do so. *LG & E Cap. Corp.*, 289 F.3d at 1069 n.4.

The last provision of the Nebraska attachment statute that the Court finds problematic is Neb. Rev. Stat. § 25-1002. That provision states in pertinent part that the claimant must provide an affidavit based on personal knowledge "describing the existence and approximate value of any of defendant's property known to the plaintiff to be subject to the jurisdiction of the court." Neb. Rev. Stat. § 25-1002(2). The Operators argue that the Seed Companies have not satisfied the "existence and approximate value" requirements of § 25-1002(2), albeit paraphrasing "existence" of the property to mean "location" of the property. *See* Filing 87 at 27. They point to the Seed Companies' repeated use of terms like "any and all" assets. Filing 87 at 27. The Seed Companies dispute only part of this argument by asserting that "there is no dispute that AltEn's real and personal assets are located in Mead, Nebraska." Filing 90 at 15. That assertion notwithstanding, there remains the issue of the "situs" of the bank accounts. Barberich's affidavit and attached exhibits go some way to identifying the value of the assets in question, *see* Filing 90 at 15, but it remains unclear what funds or other assets remain and what the value of those assets might be when the "cash burn" is over $100,000 per month. Answering that question here would be likely to degenerate into a "mini-trial" on which the Court finds the current record inadequate to make a decision.

Moreover, the Court concludes that the Seed Companies have not explained what if any additional protection attachment of the assets will provide over and above a preliminary injunction directing the Operators not to dissipate their assets. Likewise, the Seed Companies have not explained how they might be entitled to attachment if they are not entitled to a preliminary injunction. Finally, because the preliminary injunction would be directed at the Operators and the Related Entities, all of which are subject to the jurisdiction of the Court, it is irrelevant whether or not the bank accounts are "out-of-state" and whether or not they might be subject to the Court's *in rem* jurisdiction for purposes of attachment.

Thus, the Court will not give further consideration to the Seed Companies' request for prejudgment attachment pursuant to Rule 64 and Neb. Rev. Stat. §§ 25-1001 *et seq.*, either in conjunction with or in the alternative to their request for a preliminary injunction in their Joint Motion.

### B.  The Request for a Preliminary Injunction

Having concluded that a preliminary injunction is an available remedy in this case, the Court turns to consideration of whether the Seed Companies have established that they are entitled to such a remedy. The Operators contend that the Seed Companies are not, for a variety of reasons. The Court will address the parties' arguments as they relate to each of the requirements for a preliminary injunction under applicable law.

### 1.    *Standards for a Preliminary Injunction*

Rule 65 for the Federal Rules of Civil Procedure authorizes the courts to issue preliminary injunctions, but it does not identify the standard the Court must apply in deciding whether or not to grant a request for a preliminary injunction.[13] The Eighth Circuit Court of Appeals has explained that "the standard for analyzing a motion for a temporary restraining order is the same as [the standard for analyzing] a motion for a preliminary injunction." *Tumey v. Mycroft AI, Inc*., 27 F.4th 657, 665 (8th Cir. 2022). Thus, to obtain either a TRO or a preliminary injunction, "'[a] plaintiff . . . must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.'" *Tumey,* 27 F.4th at 664 (bracketed numbers inserted) (quoting *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008), and also

---

[13] Rule 65 provides, in part, "The court may issue a preliminary injunction only on notice to the adverse party." Fed. R. Civ. P. 65(a)(1). Rule 65(a)(2) also provides for consolidation of the preliminary injunction hearing with trial on the merits. Fed. R. Civ. P. 65(a)(2). The adverse parties here, the Operators, have received notice of the request for a preliminary injunction; no party has suggested that the preliminary injunction hearing should be consolidated with trial on the merits; and the Court does not find such consolidation to be appropriate.

citing *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc)).[14] No single factor is dispositive. *Id.* at 665. Furthermore, a preliminary injunction is an extraordinary remedy never awarded as of right; the primary function of a preliminary injunction is preserving the status quo until the district court has an opportunity to grant full effective relief; and requiring a non-movant to take affirmative action goes beyond the purpose of a preliminary injunction. *Id.* at 664. Lastly, the burden of establishing the propriety of a preliminary injunction is on the movant, here the Seed Companies. *Id.*

> 2.   *Likelihood of Success on the Merits*

> > a.   Applicable Standards

As to the first factor, the Eighth Circuit Court of Appeals has stated "that '[w]hile no single [*Winter*] factor is determinative, the probability of success factor is the most significant.'" *Tumey*, 27 F.4th at 665 (quoting *Carson v. Simon*, 978 F.3d 1051, 1059 (8th Cir. 2020) (cleaned up)). This factor requires the movant to demonstrate "at least a 'fair chance of prevailing.'" *Wildhawk Invs., LLC v. Brava I.P., LLC*, 27 F.4th 587, 593 (8th Cir. 2022) (quoting *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1041 (8th Cir. 2016)). The likelihood of success is considered in light of the elements of the movant's claim or claims. *See, e.g., 301, 712, 2103 & 3151 LLC v. City of Minneapolis,* 27 F.4th 1377, 1383 (8th Cir. 2022) (analyzing likelihood of success in light of the elements of the movant's "takings" claim). In considering "likelihood of success on the merits," the Court is not predetermining which party will prevail;

---

[14] Courts in this Circuit have for decades called the considerations for determining whether to grant a TRO or a preliminary injunction the "*Dataphase* factors," set out in *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109 (8th Cir. 1981) (en banc). The much more recent statements of the pertinent considerations by the Supreme Court in *Winter* and by the Eighth Circuit Court of Appeals in *Tumey*, while identifying the same considerations, give them sufficiently different definition to warrant reference to the "*Winter* factors" rather than the "*Dataphase* factors." *Compare Winter*, 555 U.S. at 20 (as quoted in the body of this decision), with *Dataphase*, 640 F.2d at 114 ("[W]hether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.").

again, the Court is only considering whether the Seed Companies' showing is sufficient to demonstrate that they have "at least a 'fair chance of prevailing.'" *Wildhawk Invs., LLC*, 27 F.4th at 593 (quoting *Richland/Wilkin Joint Powers Auth.*, 826 F.3d at 1041).

> **b. The Seed Companies Have Sufficient Likelihood of Success on the Merits to Warrant a Preliminary Injunction**

Whether the Seed Companies have sufficient likelihood of success on the merits is hotly contested, although not necessarily based on the likelihood that the Seed Companies can prove the elements of their equitable claims. *See, e.g., 301, 712, 2103 & 3151 LLC*, 27 F.4th at 1383. Instead, the Operators assert two more general impediments to the Seed Companies' likelihood of success.

> **i. The Operators' Alleged Impediments Do Not Withstand Scrutiny**

First, the Operators assert that under Nebraska law a party cannot recover money voluntarily paid under a claim of right to payment if the plaintiff knew of facts that would permit the plaintiff to dispute the claim and withhold payment. Filing 87 at 10. They contend the Seed Companies seek to recover monies they have paid to the FRG, but that the Seed Companies offer no facts to show that they have spent these funds involuntarily and that, in fact, the Seed Companies allege that their payments were voluntary. Filing 87 at 11. The Seed Companies contend that this argument is a red herring. Filing 90 at 5. They argue that they formed the FRG at the request of the US EPA and the NDEE to assist in addressing the unsafe emergency conditions at the ethanol plant created by AltEn. Filing 90 at 5. They also argue that the "emergency assistance" doctrine applies here and permits them to recover costs incurred to abate or prevent an imminent environmental hazard based on unjust enrichment and subrogation. Filing 90 at 5.

The Operators are correct that, "[n]ormally, a plaintiff cannot recover money voluntarily paid under a claim of right to payment if the plaintiff knew of facts that would permit the plaintiff to dispute the claim and withhold payment." *City of Scottsbluff v. Waste Connections of Nebraska,*

*Inc.*, 809 N.W.2d 725, 743 (Neb. 2011). That principle is not the end of the matter, however, because there are exceptions. *Id.* (citing Restatement (Third) of Restitution and Unjust Enrichment, § 1). Section 1 of the Restatement (Third) states, "A person who is unjustly enriched at the expense of another is subject to liability in restitution." Restatement (Third) of Restitution and Unjust Enrichment § 1 (2011). More specifically still, the Restatement provides in pertinent part as follows:

> (1) A person who performs another's duty to a third person or to the public is entitled to restitution from the other as necessary to prevent unjust enrichment, if the circumstances justify the decision to intervene without request.

> (2) Unrequested intervention may be justified in the following circumstances:

> * * *

> (c) the claimant may be justified in performing another's duty to the public, if performance is urgently required for the protection of public health, safety, or general welfare.

> (3) There is no unjust enrichment and no claim in restitution by the rule of this section except insofar as the claimant's intervention has relieved the defendant of an otherwise enforceable obligation.

Restatement (Third) of Restitution and Unjust Enrichment § 22 (2011). This Court has no hesitation predicting that the Nebraska Supreme Court would apply § 22 where it has applied other sections of the Restatement (Third) of Restitution and Unjust Enrichment. *See, e.g.*, *Schreiber Bros. Hog Co., LLC*, 980 N.W.2d at 904 (applying §§ 1 and 2); *City of Scottsbluff*, 809 N.W.2d at 743–44 (citing various sections); *see also* *Burdess v. Cottrell, Inc.*, 53 F.4th 442, 447 (8th Cir. 2022) ("Where the [state supreme court] has not spoken, '[a federal court] must predict how the [state] court would rule." (internal quotation marks and citation omitted)).

      The requirements of § 22 are met in this case. The Seed Companies have demonstrated that they have performed the Operators' duty to remediate and stabilize the AltEn site when doing so

was urgently required for the protection of public health, safety, and general welfare, as required by § 22(2)(c). This is so, because the NDEE found an environmental hazard presented by the unremediated AltEn site. Filing 55 at 5–6 (¶¶ 1–7). The Operators' duty to remediate and stabilize the site was an enforceable obligation under the NDEE consent decree and other directives, as required by § 22(3); that remediation was urgently required for the protection of public health and the environment, as shown by the NDEE's regulatory actions; and that remediation requires continued cooperation with FRG's clean-up efforts. Filing 93 at 6 (citing Filing 83-3). Thus, the purported "voluntariness" of the Seed Companies' assumption of the Operators' obligations does not bar their recovery on their equitable claims.

Next, the Operators argue that the Seed Companies cannot succeed on their claims against the entities with whom they lack privity of contract—Mead Cattle, Green Disposal, Platte River and the Related Entities. Filing 87 at 11. They also argue that the Seed Companies' attempt to get around this problem by seeking to disregard the corporate identity of the Related Entities is unavailing because the requirements for doing so are not met. Filing 87 at 11–18. The Seed Companies respond that their claims against these entities do not rely on written contracts, so privity is not required. Filing at 6. They also argue that any preliminary injunction would apply to the Related Entities because of the evidence of common ownership, undercapitalization, commingling, and intercompany transfers. Filing 90 at 10–11.

The Court finds first and foremost that privity is not a requirement of the equitable claims on which the Seed Companies rely for available preliminary injunctive relief. Second, even without reaching the question of whether the corporate identities of any Operators or Related Entities should be disregarded, the Court has the authority to grant a preliminary injunction not just against principal actors but also against officers, agents, servants, employees, and attorneys, as well as those persons or entities in active concert or participation with such persons. *See* Fed.

R. Civ. P. 65(d)(2); *see also, Carson v. Simon*, 978 F.3d 1051, 1062 (8th Cir. 2020); *Union Pac. R.R. Co. v. Bhd. of Maint. of Way Employees Div. of Int'l Bhd. of Teamsters*, 511 F. Supp. 3d 987, 1006 (D. Neb. 2021). This authority readily encompasses most of the entities that the Seed Companies seek to enjoin from dissipating assets of the Operators where the ownership and operations of the various entities are interwoven.[15]

        ii.       The Seed Companies Have a Fair Chance of Proving
                      Their Equitable Claims

Although the likelihood of success on the merits is considered in light of the elements of the movant's claim or claims, *see, e.g., 301, 712, 2103 & 3151 LLC,* 27 F.4th at 1383, the parties have neglected to set out the elements of any of the Seed Companies' claims on which their Joint Motion for Preliminary Injunction is based. Indeed, the identification of those claims has not been entirely consistent. In their opening brief, the Seed Companies based their arguments for likelihood of success on their claims of breach of contract, breach of warranty, negligence, indemnity, and contribution. Filing 55 at 15. In contrast, in their reply brief, in response to the Operators' reliance on *Grupo Mexicano*, the claims on which they base their right to seek a preliminary injunction—at least the claims that the Court finds make such relief available—are equitable claims of subrogation, unjust enrichment, and under the UVTA. Filing 90 at 11–12.

The Operators have not challenged the Seed Companies' likelihood of success on any of their claims on the basis of inability or likely inability to establish the elements of any of the equitable claims. The Seed Companies argue that the record is clear that the Operators' actions and omissions directly caused the February 2021 discharge event, causing damages and

---

[15] For example, although neither the organizational chart nor the Complaint provides any information about Mead Acquisition Company, LLC, the Berberich affidavit indicates that Mead Acquisition Company, LLC, like Falcon Energy, LLC, was involved in certain financing matters for the ethanol manufacturing plant. *See* Filing 56 at 2 (¶¶ 6–9). The exception is Green Cycle Solutions. The organizational chart submitted as the Seed Operators' Exhibit 58-2 shows that Green Cycle Solutions, LLC, changed its name to Green Disposal Mead, LLC—a defendant Operator—on September 5, 2019. Thus, enjoining Green Cycle Solutions, LLC, would be redundant.

necessitating remediation efforts. Filing 90 at 4. Consequently, they argue that they have a "fair

chance" of prevailing on the merits of their equitable claims in these consolidated lawsuits. Filing

90 at 4. They point to documentation of the Operators' failure to remediate the environmental mess

they created, which required the Seed Companies to step forward to address that mess. Filing 90

at 4–5. They also assert that unjust enrichment and subrogation allow for recovery where they have

paid the debts that properly should have been paid by the Operators. Filing 90 at 6. They also point

to the intercompany transfers and commingling of assets as the basis for voidable transfers. Filing

90 at 10.

The Court turns to consideration of the Seed Companies' likelihood of success on the

pertinent claims.

The Nebraska Supreme Court has explained.

> Under the [Uniform Fraudulent Transfer Act (UFTA)], a creditor
> may reach assets transferred by a debtor if the transfer was fraudulent. . . .
> In an action to set aside an actually fraudulent transfer or obligation under
> § 36-705(a)(1) of the UFTA, it is the plaintiff's burden to prove by clear
> and convincing evidence that (1) the debtor made a transfer or incurred an
> obligation, (2) the plaintiff was a creditor of the debtor, and (3) the debtor
> made the transfer or incurred the obligation with actual intent to hinder,
> delay, or defraud any creditor of the debtor.

*Korth*, 935 N.W.2d at 237 (internal footnote citations omitted) (citing Neb. Rev. Stat. §§ 36-705,

36-706, and 36-708). Again, because the pertinent provisions of the UVTA, Neb. Rev. Stat. §§ 36-

805, 36-806, 36-808, are essentially identical, the Court concludes that the elements set out in

*Korth* are also the elements of a UVTA claim.

As to the last element of such a claim, under both UFTA § 36-705 and UVTA § 36-805,

> (b) In determining actual intent under subdivision (a)(1) of this section,
> consideration may be given, among other factors, to whether:
>
> (1) the transfer or obligation was to an insider;
>
> (2) the debtor retained possession or control of the property transferred after
> the transfer;

34

(3) the transfer or obligation was disclosed or concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor.

Neb. Rev. Stat. § 36-805(b). The UVTA adds, "A creditor making a claim for relief under subsection (a) of this section has the burden of proving the elements of the claim for relief by a preponderance of the evidence." Neb. Rev. Stat. § 36-805(c).

As to the first two elements of the UVTA claim, the Seed Companies have for example pointed to evidence that one of the inter-related Operators, Mead Cattle, made a transfer to E3 of the proceeds of its sale to Champion, and that the Seed Companies became creditors of the Operators by taking on the Operators' obligations to remediate the AltEn site. *See Korth*, 935 N.W.2d at 237. Financial records that the Operators produced on November 10, 2022, indicate that proceeds from the sale of Mead Cattle in the amount of $2,640,000.00 were deposited into a checking account owned by E3 at Wells Fargo Bank ending in x7958. Filing 55 at 9 (¶ 25); *see also* Filing 58-11 at 2 (E3 account x7958 statement 7/31/21); Filing 58-12 at 2 (E3 Wells Fargo account check register). There is also a litany of NDEE regulatory actions and a consent order

establishing the Operators' obligation to remediate the AltEn site. Filing 55 at 5–6 (¶¶ 1–7); Filing 93 at 6 (citing Filing 83-3).

As to the "intent" element, considering pertinent factors set out in Neb. Rev. Stat. § 36-805(b), there is sufficient evidence that E3 was an "insider" among the inter-related companies, *see, e.g.,* Filing 87 at 3 (¶ 4) (admitting that Mead Cattle was wholly owned by E3); that the transfer was not timely disclosed to the Seed Companies, *see* Filing 58 at 3 (¶ 14–19) (asserting disclosure was not made until November 2022); *but see* Filing 87 at 28 (claiming disclosure was made in April (citing Filing 82-1)); that AltEn at the very least was insolvent before the transfer was made, *see* Filing 56 at 2 (¶ 7) (averring that AltEn was insolvent in 2016); that when the transfer was made the Operators had been threatened with suit or actually sued for failure to comply with regulatory requirements, *see* Filing 55 at 9 (¶ 22) (asserting the sale of Mead Cattle was effective July 1, 2021); Filing 55 at 6 (¶ 7) (asserting that the State of Nebraska filed suit on March 1, 2021); and that not only did the transfer involve substantially all of Mead Cattle's assets, but substantially all of the cash available to the Operators, *see* Filing 55 at 9 (¶ 28); *see also* Filing 56 at 4 (Barberich Aff. at ¶ 18). *See generally* Neb. Rev. Stat. § 36-805(b) (listing these and other considerations as relevant to "intent"). Thus, the record shows that the Seed Companies have "at least a 'fair chance of prevailing'" on this claim. *Wildhawk Invs., LLC,* 27 F.4th at 593 (quoting *Richland/Wilkin Joint Powers Auth.,* 826 F.3d at 1041).[16]

Next, the Nebraska Supreme Court has recognized that "[s]ubrogation is an equitable doctrine applied in order to avoid unjust enrichment when one party has discharged an obligation

---

[16] The Court was unwilling to make a similar determination with regard to "intent to defraud" under the Nebraska attachment statute, Neb. Rev. Stat. § 25-1002(7). There are two distinguishing factors as to the UVTA statute, however. First, the element of the UVTA claim requires proof of "actual intent to hinder, delay, or defraud any creditor of the debtor," not simply "intent to defraud." *Korth,* 935 N.W.2d at 237 (internal footnote citations omitted). Second, Neb. Rev. Stat. § 36-805(b) sets out pertinent factors to determine "intent," which provides guidance that was lacking under the attachment statute. Thus, even if "intent to defraud" is doubtful on the present record, "intent to hinder [or] delay" is sufficiently supported to give the Seed Companies a fair chance of proving this element.

which should have been satisfied in whole or in part by another." *Universal Underwriters Ins. Co. v. Farm Bureau Ins. Co. of Nebraska*, 498 N.W.2d 333, 335–36 (Neb. 1993). The Nebraska Supreme Court has explained that "equitable subrogation" is "the substitution of one person in the place of another with reference to a lawful claim, demand, or right, so that the one who is substituted succeeds to the rights of the other in relation to the debt or claim, and its rights, remedies, or securities." *Edwards v. Est. of Clark*, 982 N.W.2d 788, 794 (Neb. 2022). Thus, "a party seeking recovery [is required] to show it has discharged the liability or paid the debt of the party from which it seeks to recover." *Id.*

As explained above, in relation to the UVTA claim, there is sufficient evidence in the record to suggest that the Seed Companies have discharged the liability of the Operators to remediate the AltEn site. *Id.* (first element). Again, there is a litany of NDEE regulatory actions and a consent order establishing the Operators' obligation to remediate the AltEn site. Filing 55 at 5–6 (¶¶ 1–7); Filing 93 at 6 (citing Filing 83-3). The evidence shows that to date the Seed Companies have expended $27,896,473 in their efforts to stabilize and remediate the AltEn site, thus discharging the Operators' obligation. Filing 55 at 7 (¶ 15). The Seed Companies are now seeking in this action to recover from the Operators for the Seed Companies' discharge of that obligation. *Edwards*, 982 N.W.2d 794 (second element is that the creditor is now seeking to recover for its discharge of the debtor's obligation). Thus, the record shows that the Seed Companies have "at least a 'fair chance of prevailing'" on this subrogation claim, as well as the equitable UVTA claim. *Wildhawk Invs., LLC*, 27 F.4th at 593 (quoting *Richland/Wilkin Joint Powers Auth.*, 826 F.3d at 1041).

That leaves the third equitable claim, unjust enrichment. When considered separately from subrogation, "unjust enrichment . . . claims are contract substitutes that courts apply to prevent injustice." *Equestrian Ridge Homeowners Ass'n v. Equestrian Ridge Ests. II Homeowners Ass'n,*

953 N.W.2d 16, 37 (Neb. 2021). "Unjust enrichment claims do not arise from an express or implied agreement between the parties; rather, they are imposed by law 'when justice and equity require the defendant to disgorge a benefit that he or she has unjustifiably obtained at the plaintiff's expense.'" *Schreiber Bros. Hog Co., LLC v. Schreiber*, 980 N.W.2d 890, 903 (Neb. 2022) (quoting *Bloedorn Lumber Co. v. Nielson*, 915 N.W.2d 786, 792 (Neb. 2018)). Although the obligation is "imposed by law," the Nebraska Supreme Court recognized that "unjust enrichment" is an "equitable doctrine." *Ahrens v. Dye*, 302 N.W.2d 682, 685 (Neb. 1981). "To recover on a claim for unjust enrichment, the plaintiff must show that (1) the defendant received money, (2) the defendant retained possession of the money, and (3) the defendant in justice and fairness ought to pay the money to the plaintiff." *Zook v. Zook*, 978 N.W.2d 156, 161 (Neb. 2022).

Again, the record shows that the Operators received money from the sale of Mead Cattle that was deposited into E3's bank account. *See id.* (first element); see also Filing 55 at 9 (¶ 25); *see also* Filing 58-11 at 2 (E3 account x7958 statement 7/31/21); Filing 58-12 at 2 (E3 Wells Fargo account check register). The record also shows that the Operators retained possession of the money through E3. *See Zook*, 978 N.W.2d at 161 (second element); *see also* Filing 87 at 4 (¶ 14) (admitting that E3 has provided the funds necessary for the Operators to continue operations and defend this litigation and other Nebraska state court lawsuits). Finally, where the Seed Companies have discharged the Operators' obligation to remediate the AltEn site, there is sufficient evidence that justice and fairness require the money in the E3 account to be paid to the Seed Companies. *See Zook*, 978 N.W.2d at 161 (third element); *see also* Filing 55 at 7 (¶ 15) (showing that to date the Seed Companies have expended $27,896,473 in their efforts to stabilize and remediate the AltEn site, thus discharging the Operators' obligation). Thus, the record shows that the Seed Companies have "at least a 'fair chance of prevailing'" on this unjust enrichment claim, as well as

the other two equitable claims. *Wildhawk Invs., LLC*, 27 F.4th at 593 (quoting *Richland/Wilkin Joint Powers Auth.*, 826 F.3d at 1041).

In short, this "most significant" requirement for a preliminary injunction weighs heavily in the Seed Companies' favor. *Tumey*, 27 F.4th at 665 (quoting *Carson*, 978 F.3d at 1059).

3.   *Irreparable Harm*

a.   Applicable Standards

To obtain a preliminary injunction, the movant must show that "irreparable injury is likely in the absence of an injunction, not merely a 'possibility' of irreparable harm before a decision on the merits can be rendered." *Id.* at 664–65 (quoting *Winter*, 555 U.S. at 20). "The failure of a movant to show irreparable harm is an 'independently sufficient basis upon which to deny a preliminary injunction.'" *Sessler v. City of Davenport*, 990 F.3d 1150, 1156 (8th Cir. 2021) (quoting *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003)). Somewhat more specifically, "Irreparable harm occurs when a party has no adequate remedy at law." *Sleep No. Corp. v. Young*, 33 F.4th 1012, 1018 (8th Cir. 2022) (quoting *General Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009)). Thus, for example, "'[e]conomic loss, on its own, is not an irreparable injury so long as the losses can be recovered'"—*i.e.*, can be recompensed by money damages. *Wildhawk Invs.*, LLC, 27 F.4th at 597 (quoting *DISH Network Serv. L.L.C. v. Laducer*, 725 F.3d 877, 882 (8th Cir. 2013)).

The Court notes that an exception to the rule that "economic loss" alone does not constitute irreparable harm, *see Wildhawk Invs., LLC*, 27 F.4th at 597, is that "[t]he threat of unrecoverable economic loss, however, does qualify as irreparable harm." *Iowa Utilities Bd. v. F.C.C.*, 109 F.3d 418, 426 (8th Cir. 1996) (citing *Baker Elec. Coop., Inc. v. Chaske*, 28 F.3d 1466, 1473 (8th Cir. 1994), and *Airlines Reporting Corp. v. Barry*, 825 F.2d 1220, 1227 (8th Cir. 1987)). On this

exception, the decision of the Eighth Circuit Court of Appeals in *Airlines Reporting Corporation* is particularly instructive:

> The authority of a trial court to issue a preliminary injunction to ensure the preservation of an adequate remedy is well established. *See Deckert v. Independence Shares Corp.*, 311 U.S. 282, 290, 61 S.Ct. 229, 234, 85 L.Ed. 189 (1940) (preliminary injunction restraining transfer of funds by trustee was proper where there were allegations that defendant was insolvent); *Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43, 52 (1st Cir.1986) ("injunctive relief restraining the transfer of assets can be granted when the district court finds that the defendant may be insolvent before a final judgment is entered"); *Roland Machinery Co. v. Dresser Industries*, 749 F.2d 380, 386 (7th Cir.1984) (preliminary injunction may be granted upon a showing that an award of damages will be inadequate because defendant may be insolvent by the end of trial); *Productos Carnic, S.A. v. Central American Beef and Seafood Trading Co.*, 621 F.2d 683, 686 (5th Cir.1980) (preliminary injunctive relief is available to protect a damages remedy). We similarly hold that a preliminary injunction may issue to protect plaintiff's remedy in the circumstances of this case. In deciding whether the plaintiff has demonstrated sufficient evidence to support the claim that it will be unable to recover absent a preliminary injunction, the Seventh Circuit has concluded, and we agree, that "[t]he resolution of this issue depends on two factors—the [non-movant's] resources and the potential magnitude of eventual damages." *Signode Corp. v. Weld-Loc Systems, Inc.*, 700 F.2d 1108, 1111 (7th Cir.1983). In the present case, ARC has demonstrated a clear probability that defendants will not be able to satisfy an award of adequate damages. We therefore agree with the District Court that ARC is entitled to a preliminary injunction to protect its remedy.

*Airlines Reporting Corp. v. Barry*, 825 F.2d 1220, 1227 (8th Cir. 1987).

> b. The Seed Companies Have Demonstrated That Irreparable Harm is Likely Without a Preliminary Injunction

This "irreparable harm" requirement for preliminary injunctive relief is also hotly contested. The Seed Companies argue that this Court has repeatedly found that the insolvency of a defendant or the dissipation of its assets are grounds for a preliminary injunction. Filing 55 at 16. They contend that financial disclosures support a conclusion that AltEn has been insolvent since at least December of 2016. Filing 55 at 16. They also contend that the unsustainable "cash burn" rate of over $100,000 per month means that without a preliminary injunction, their losses from discharging the Operators' obligations will be unrecoverable. Filing 55 at 16. The Operators

contend that because the Seed Companies ultimately seek monetary damages, the Seed Companies are unable to demonstrate that they have no adequate remedy at law. Filing 87 at 19. The Operators also argue that the possibility that the judgment may prove uncollectible depending on subsequent circumstances does not make a loss truly unrecoverable. Filing 87 at 19. In reply, the Seed Companies reiterate their contention that a defendant's insolvency is sufficient to establish irreparable harm. Filing 90 at 8. They also argue that in deciding whether economic loss is unrecoverable, courts consider the opposing party's resources and the potential magnitude of eventual damages. Filing 90 at 8. They argue that in this case the potential damages to the Seed Companies and to the State of Nebraska demonstrate the need to preserve available cash assets, supporting the grant of an injunction. Filing 90 at 9.

This case involves precisely the issue with an unrecoverable damages award discussed in *Airlines Reporting Corporation*. *Airlines Reporting Corp.*, 825 F.2d at 1227. The Seed Companies have already expended, and now seek to recover, almost $28 million dollars for their remediation efforts at the AltEn site. Filing 55 at 7 (¶ 15). It appears that AltEn has been insolvent since 2016. Filing 55 at 12 (¶ 56). The Operators are entirely dependent on E3 for funds. Filing 87 at 4 (¶ 14) (admitting that E3 has provided the funds necessary for the Operators to continue operations and defend this litigation and other Nebraska state court lawsuits). Moreover, the monthly "cash burn" rate to sustain the Operators over the last year has been approximately $136,299.00, which increases to $158,380.00 when considering transfers from E3 to other entities such as E3 Operating Company and E3 Patent HoldCo. Filing 55 at 10 (¶ 37). As a result, the record suggests that as of mid-December 2022, the cash assets held in the E3 bank account will be available only for somewhere between the next 10.01 months and 11.34 months. Filing 55 at 10 (¶ 38). As of October 2022, the available cash assets had decreased to $1,796,578.39. Filing 55 at 11 (¶ 39). The strong likelihood that the cash will be dissipated before any judgment is entered demonstrates that the

Seed Companies' harm in the absence of a preliminary injunction is irreparable. *Airlines Reporting Corp.*, 825 F.2d at 1227.

Thus, this second *Winter* factor also weighs heavily in favor of granting a preliminary injunction. *Tumey*, 27 F.4th at 664.

4.    *The Balance of Harms Warrants Some Limitations on the Extent of the Preliminary Injunction*

The third *Winter* factor considers the "balance of equities" or the "balance of harms." *Tumey*, 27 F.4th at 664; *MPAY Inc. v. Erie Custom* Comput. *Applications, Inc*., 970 F.3d 1010, 1020 (8th Cir. 2020). The Seed Companies contend that they will be injured by the dissipation of assets that they are entitled to recoup from the Operators. Filing 55 at 17. They contend that, in contrast, the Operators will not be injured during the pendency of the litigation, because there is no justification for E3 to transfer money to companies that are no longer operating. Filing 55 at 17. The Operators argue that they will be irreparably harmed by a preliminary injunction that destroys their business or makes them unable to continue litigation. Filing 87 at 20. They argue that if the Court enters a complete asset freeze, they will be unable to pay their employees, operating expenses, or permitting fees. Filing 87 at 21. They argue further that the "drastic" injunction the Seed Companies seek would prevent them from paying their attorneys, effectively deciding the outcome of this and a number of state court lawsuits. Filing 87 at 21. In reply, the Seed Companies argue that there can be no harm to the Operators when they have not contributed monetarily to site remediation and have stated that they will not be paying for certain matters required by the NDEE, even though E3 is currently providing cash infusions. Filing 90 at 9. The Seed Companies argue that the Operators should not be heard to argue that they need to keep funds available to comply with NDEE requirements while refusing to meet those requirements even though cash is available to them. Filing 90 at 9. The Seed Companies argue in the alternative that

42

the Court should require the Operators to seek approval for certain expenditures. Filing 90 at 15–16.

This factor asks whether "the balance of equities tips in [the movant's] favor." *Tumey*, 27 F.4th at 664 (internal quotation marks omitted). Another formulation of this factor requires the court to consider the state of the balance between the harm to the movant and the injury that granting the injunction will inflict on other litigants in the case. *Eggers v. Evnen*, 48 F.4th 561, 564 (8th Cir. 2022). As the Court has already concluded, the harm to the Seed Companies is substantial and irreparable. At the same time, there is some merit in the Operators' contention that a total asset freeze would effectively put the Operators out of business and damage their position in this and other litigation. Moreover, the Court is persuaded by the concern of *amicus curiae* the State of Nebraska that the requested relief if granted in whole would make AltEn unable to fund the few activities it has been performing for necessary permit compliance and compliance with the consent order with the State. Filing 93 at 2. Consequently, the State requests that the Court consider including language in the preliminary injunction that would allow AltEn, with permission of the Court, to use funds to perform certain monitoring and permitting activities in support of remediation activities. Filing 93 at 9.

Thus, while this factor does not outweigh the factors favoring a preliminary injunction, it does warrant some limitation on the extent of the "freeze" of assets to accommodate certain demonstrably necessary expenses.

5.    *The Public Interest Also Warrants Some Limitations on the Extent of the Preliminary Injunction*

The final *Winter* factor is whether a preliminary injunction is in the public interest. *Tumey*, 27 F.4th at 664. The parties' arguments on this factor are largely reprises of their arguments on the balance of interests. The Seed Companies argue that the public interest favors a preliminary injunction, because it would preserve monetary assets that could be used to further remediation

efforts at the site. Filing 55 at 17. In response, the Operators argue that the public interest would not be served by preventing them from complying with the requirements imposed by the NDEE. Filing 87 at 22. In reply, the Seed Companies agree that the public interest favors remediation of a site posing a danger to public health. Filing 90 at 11. The Seed Companies then assert in the alternative that limiting the preliminary injunction to allow the Operators to make payments as required by NDEE would serve the public interest. Filing 90 at 11.

The Court finds the State of Nebraska's concern about a total asset "freeze" is a persuasive statement of the public interest. It also seems likely to the Court that the public has an interest in enforcing or at least allowing a party to meet contractual obligations, like those under the consent agreement with the State. *See, e.g., Sleep No. Corp. v. Young*, 33 F.4th 1012, 1019 (8th Cir. 2022). It seems equally likely that the public interest favors enforcing equitable obligations, particularly when they serve the public interest in protecting the environment and public health. Thus, while the public interest favors both equitable concerns and the protection of the environment, it counsels a limitation on the extent of any preliminary injunction to allow the Operators to perform certain tasks, including monitoring and permitting.

After balancing the relevant factors, the Court concludes that a preliminary injunction in some form should issue.

### C.  Remaining Matters

Because the Court concludes that a preliminary injunction should issue, the remaining questions are the scope of the preliminary injunction and the appropriate bond for its issuance. The Supreme Court has explained that the scope of a preliminary injunction is "often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, ___ U.S. ___, 137 S. Ct. 2080, 2087 (2017) (per curiam). "Part of our consideration is whether the injunctive relief is 'no more burdensome to the defendant than

necessary to provide complete relief to the plaintiffs.'" *Nebraska v. Biden*, 52 F.4th 1044, 1048 (8th Cir. 2022) (quoting *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994)). Another concern is that the injunctive relief must be "workable." *Id.* (citing *North Carolina v. Covington*, ___ U.S. ___, 137 S. Ct. 1624, 1625 (2017) (per curiam)).

As to whom the Court can enjoin, the Court has the authority to grant a preliminary injunction not just against principal actors but also against officers, agents, servants, employees, and attorneys, as well as those persons or entities in active concert or participation with such persons. *See* Fed. R. Civ. P. 65(d)(2); *see also, Carson v. Simon*, 978 F.3d 1051, 1062 (8th Cir. 2020); *Union Pac. R.R. Co. v. Bhd. of Maint. of Way Employees Div. of Int'l Bhd. of Teamsters*, 511 F. Supp. 3d 987, 1006 (D. Neb. 2021). The Court observed above that this authority readily encompasses most of the entities that the Seed Companies seek to enjoin from dissipating assets of the Operators where the ownership and operations of the various entities are interwoven. For example, although neither the organizational chart nor the Complaint provides any information about Mead Acquisition Company, LLC, the Berberich affidavit indicates that Mead Acquisition Company, LLC, like Falcon Energy, LLC, was involved in certain financing matters for the ethanol manufacturing plant. *See* Filing 56 at 2 (¶¶ 6–9). The exception is Greencycle Solutions, LLC. The organizational chart submitted as the Seed Operators' Exhibit 58-2 shows that Greencycle Solutions, LLC, changed its name to Green Disposal Mead, LLC—a defendant Operator—on September 5, 2019. Thus, enjoining Greencycle Solutions, LLC, would be redundant.

The Court also observed above that the scope or extent of the preliminary injunction in this case should be limited to allow the Operators to perform certain tasks, including monitoring and permitting, and should not prevent them from continuing necessary litigation. The parties and *amicus curiae* the State of Nebraska identified various categories of likely necessary expenses.

45

The Seed Companies concede only that there is "a need for Defendants to pay their attorneys for defense of this litigation and to pay for costs associated with remediation activities at the AltEn Site." Filing 90 at 15–16. The Operators' list is somewhat more detailed. They seek continued access to and use of funds "for ordinary business purposes," which they assert "should include employing their employees, accountants, attorneys, contractors, and others necessary for the Defendant Entities to defend this Consolidated Litigation (and other lawsuits), engage in other activities necessary to maintain AltEn's NPDES Permit, and comply with the February 22, 2022 Consent Order." Filing 87 at 31–32. The State argues that the Operators should have "access and use [of] funds to perform (1) the quarterly groundwater monitoring (and submit an updated Groundwater Monitoring Plan) as required by NPDES Permit No. NE0137634, (2) comply with the storm water obligations set forth in NPDES Permit No. NE0139882, (3) comply with the February 23, 2022 Consent Order, including implementation of an approved Step 6/Step 7 Work Plan, (4) support the remediation activities conducted by Plaintiffs through the VCP; and (5) any other actions necessary for permit compliance or other remediation activities identified by the State." Filing 93 at 9. Thus, while there is some overlap, only the Operators and the Court seem to be concerned about expenses for other litigation and payroll (to the extent that payroll is not necessary to perform permitting). However, the Court finds that there are no "ordinary business expenses," where the Operators' normal business operations are shutdown.

The Court pressed the parties at the preliminary injunction hearing to show the amount needed for each of the necessary expense categories on a monthly basis. Unfortunately, neither of the parties suggested an amount for any of the categories of necessary expenses they cited.[17] In short, because of the complete lack of proof on the monthly amounts needed for any of the

---

[17] The Seed Companies did suggest at the preliminary injunction hearing that the total monthly amount allowed for all expenses should be no more than $25,000. They offered no explanation for how they arrived at that figure.

necessary categories of expenses, the Court would have to speculate as to what might constitute a permissible "draw" upon the Operators' assets. The Court declines to engage in such speculation.[18]

Although the Court will allow the Operators access to assets for certain demonstrably necessary expenses, the Court will otherwise enjoin the Operators, their officers, agents, servants, employees, attorneys, and other persons or entities who are in active concert or participation with the Operators from dissipating assets pending the conclusion of this litigation.

The Court concludes demonstrably necessary expenses fall into the following categories:

1.      Funds necessary to continue monitoring and permitting, including payment of contractors, for but not limited to

a.      the quarterly groundwater monitoring (and submit an updated Groundwater Monitoring Plan) as required by NPDES Permit No. NE0137634;

b.      compliance with the storm water obligations set forth in NPDES Permit No. NE0139882;

c.      compliance with the February 23, 2022 Consent Order, including implementation of an approved Step 6/Step 7 Work Plan;

d.      support of the remediation activities conducted by Plaintiffs through the VCP; and

e.      any other actions necessary for permit compliance or other remediation activities identified by the State.

2.      Funds necessary to pay the Operators' attorneys and attorneys for employees working on their behalf sued in this litigation;

---

[18] Although the Court believes the categories of allowed expenses are sufficiently descriptive to guide the Operators in this case, the Court likewise concedes that it is not possible to list every expense that is allowed or not allowed pursuant to the preliminary injunction being issued. The Court expects the parties to consult as to any dispute as to what constitutes allowable expenses before any such dispute is brought to the attention of the Court. The Court encourages the parties to consult and if possible agree on what expenses and in what amounts will be allowed going forward to eliminate unnecessary disputes in the future.

3.      Funds necessary to pay the Operators' attorneys and attorneys for employees working on their behalf sued in other litigation, whether pending in state or federal court; and

4.      Funds necessary to comply with any requirements of federal, state, or local taxing authorities.

Turning to the bond requirement, Rule 65(c) states, "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The Court reads this language to make a bond mandatory before a preliminary injunction can issue. Nevertheless, "[t]he amount of the bond rests within the sound discretion of the trial court and will not be disturbed on appeal in the absence of an abuse of that discretion." *Richland/Wilkin Joint Powers Auth. v. United States Army Corps of Engineers*, 826 F.3d 1030, 1043 (8th Cir. 2016) (quoting *Stockslager v. Carroll Elec. Coop. Corp.*, 528 F.2d 949, 951 (8th Cir. 1976)).

The Seed Companies request a bond in a "nominal" amount, which they suggest would be $500 or less. They argue such a bond is sufficient because there is no basis to find that the Operators will suffer loss as a result of a "wrongful" attachment, where the Operators are insolvent and non-operational. Filing 55 at 20. The Operators argue that the bond should be set at an amount equivalent to the cash assets enjoined. Filing 87 at 30. This is so, they contend, because the full asset "freeze" that the Seed Companies seek would force the cessation of their operations. Filing 87 at 31.

The Court finds some merit in the Operators' argument that the proper amount "to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained," as required by Fed. R. Civ. P. 65(c), is not "nominal" in this case. Even with the limitations that the Court will impose on the scope of the preliminary injunction, the Operators will be deprived

of certain operating capital and will be unable to pursue any activities other than those set out above. The remaining funds that would be "frozen" beyond those required for necessary expenses are something less than the $1.8 million dollars remaining in the E3 bank account in mid-December, but considerably more than $500. The Court is also aware that the "cash burn" will continue, even if somewhat lessened, under the preliminary injunction. Consequently, the Court sets the bond at $50,000.

### III. CONCLUSION

Upon the foregoing,

1.      The Seed Companies' Joint Motion for Preliminary Injunction and Order of Immediate Attachment Pursuant to Fed. R. Civ. P. 65(a), 64(a)–(b), and Neb. Rev. Stat. § 25-1001 *et seq.*, Filing 51, is granted to the extent that the Court has not otherwise limited the scope and other details of the requested preliminary injunction; and

2.      The Court shall enter the preliminary injunction as a separate order.


Dated this 8th day of February, 2023.


BY THE COURT:

Brian C. Buescher
United States District Judge